UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ENTITLE INSURANCE COMPANY, | ) ) ) | CASE NO. 1:11-CV-01193 |
| Plaintiff | ) ) | JUDGE ADAMS |
| v. | ) ) | |
| DARWIN SELECT INSURANCE  COMPANY, | ) ) ) | **MEMORANDUM OF OPINION AND ORDER** |
| Defendant | ) | |

This matter appears before the Court on cross motions for summary judgment from Plaintiff EnTitle Insurance Company ("EnTitle") and Defendant Darwin Select Insurance Company ("Darwin"). For the following reasons, the Court GRANTS Defendant Darwin's Motion and DENIES Plaintiff EnTitle's Motion.

## I. INTRODUCTION

This matter arises between EnTitle and Darwin over a coverage dispute under a Professional Liability Insurance Policy issued by Darwin to EnTitle. EnTitle hired an agent, Direct Title Insurance Agency ("Direct Title"), to offer title insurance to clients on behalf of EnTitle. EnTitle offered closing protection letters ("CPLs") which obligated EnTitle to reimburse clients for any loss stemming from Direct Title's fraud, dishonesty or negligence in the handling of the closings of title insurance. Direct Title thereafter misappropriated client funds, and the clients with CPLs sought indemnification from EnTitle. EnTitle paid for the losses stemming from Direct Title's misconduct and sought indemnification from Darwin under its Professional Liability Insurance Policy. EnTitle claims that it, through Direct Title, engaged in a Professional

Liability Wrongful Act, and that Direct Title is an entity in which it is legally responsible. Darwin disputes both of these assertions, and denies that it offers coverage for this type of loss.

## II. FACTS AND PROCEDURAL HISTORY

### A. The Policy

The following facts are undisputed. EnTitle is a title insurance company headquartered in Ohio. In August 2007, Darwin issued four successive insurance policies to EnTitle's parent company, EnTitle Direct Group, Inc. The relevant policy in this dispute is the Private Risk-Transfer Organizations Management and Professional Liability Insurance Policy that provides claims-made coverage for a period from August 2, 2010 to July 25, 2011 ("the Policy"). The Policy includes four separate insuring agreements, but the only insuring agreement at issue is the Professional Liability Insuring Agreement[1].

Terms relevant to this matter and defined in the Policy are:

1) Loss- "Defense Expenses, damages, pre-judgment interest, post-judgment interest, judgments, awards, settlements, punitive, or exemplary damages where insurable under applicable law, or other amounts that an Insured is legally obligated to pay as a result of a Claim." Doc. 3-1 at pg. 20.

*The Policy also provides specific exclusions- one being "amounts due pursuant to an express contract or agreement, including but not limited to any amount due under any contractual provision for liquidated damages or pre-agreed damages or penalties, or any similar contractual remedy." *Id.*

2) Professional Liability Wrongful Act- "any actual or alleged act, error, omission, misstatement or misleading statement in the performance of or failure to perform Professional Services….by any Insured, or by an individual or entity for whom the Company is legally responsible." *Id.* at pg. 22.

3) Professional Services-"services performed by the Company or any Insured Person on behalf of the Company, for a policyholder, customer or client of the Company, pursuant to a policy of insurance issued by, or a written contract

---

[1] The other insuring agreements include Management Liability, Employment Practices Liability and Network Security Liability, which do not apply here.

with, the Company, in the usual and customary conduct of the Company's business, for a fee or other business consideration." *Id.* at pg. 22.

EnTitle submitted yearly applications for coverage under the Policy. In the application signed August 5, 2010, EnTitle sought coverage for the Professional Services of "claims handling and adjusting" only.  At no time did the application disclose to Darwin that EnTitle was providing any services other than "claims handling and adjusting." The Policy limited coverage to $3,000,000.

### B. Procedural History

EnTitle filed a one-count Complaint on June 9, 2011 asserting a Breach of Contract Claim against Darwin seeking the limit ($3,000,000) under the Professional Liability Insuring Agreement. EnTitle, thereafter, amended its Complaint, reorganizing the facts but asserting the same Breach of Contract Claim against Darwin. Doc. 3. On August 1, 2011, Darwin filed an Answer to the Amended Complaint along with a two-count counterclaim for Declaratory Judgment. Darwin disputes that it is obligated to reimburse EnTitle and argues that the CPLs are "contract[s] or polic[ies] of insurance" outside the definition of "Loss" under the Policy, and that EnTitle did not engage in a Professional Liability Wrongful Act as defined by the Policy. On August 18, 2011, EnTitle answered Darwin's counterclaim, admitting that EnTitle agreed to reimburse clients for Loss stemming from Direct Title's misconduct. EnTitle denies, however, that the CPLs are contracts excluded under the Loss provision of the Policy. EnTitle also asserts that Direct Title is "an individual or entity for whom the Company was legally responsible", and therefore a Professional Liability Wrongful Act was triggered under the Policy.  On May 4, 2012, EnTitle moved for summary judgment on its Breach of Contract claim. Darwin moved for summary judgment on its Declaratory Judgment claim on the same day. These matters have been fully briefed and are ripe for review.

### C. Material Facts

On December 1, 2008, EnTitle entered into an Issuing Agency Agreement ("Agreement") with Direct Title. Direct Title issued title insurance in numerous states on behalf of EnTitle as a "non-exclusive policy issuing agent." Doc. 27-4 at ¶ 1. Direct Title's obligations as a policy issuing agent included authorization  to "execute, counter-sign, and issue commitments, policies, judicial reports, endorsements and other forms of title evidence authorized by EnTitle", among other responsibilities specified in the Agreement. *Id.* at ¶ 3. The Agreement states "except for the purposes of issuing and delivering title evidence, subject to and in accordance with the terms and provisions of this Agreement, AGENT is an independent contractor, and shall be in full and complete control of the operation of his/her/its title office, including full control of all personnel." *Id.* at ¶ 16. The Agreement also required Direct Title to maintain segregated accounts for monies entrusted to it and permit EnTitle to examine its books. The Agreement also addresses EnTitle's issuance of CPLs. EnTitle describes them as "a written express contract in the form of a letter under which  EnTitle becomes legally responsible for an agent's fraud, dishonesty or negligence in the handling of funds at closings involving property for which the addressee has purchased a title insurance policy from EnTitle." Doc. 31-1 at ¶ 8.

The Agreement states:

EnTitle may, from time to time, issue a "closing protection letter" to a prospective insured or other party to a real estate transaction being processed by AGENT, the effect of which is to bind ENTITLE to indemnify the addressee thereof against certain Losses resulting from AGENT'S errors, omissions or misconduct in acting as escrow AGENT to the parties to the transaction, all in accordance with the terms and conditions stated in such letter. In the event ENTITLE makes payment of any claim arising out of the conduct of AGENT's escrow business (whether or not based on such letter of indemnity)…AGENT shall promptly reimburse ENTITLE for the amount of ENTITLE's expenditures.

4

Doc. 27-4 ¶ 11. EnTitle acknowledges that Direct Title was its Agent for purposes of issuing title insurance policies, but it denies Direct Title was its Agent in the handling of closings and escrow funds. All but two of the CPLs state: "The Issuing Agent is the Company's Agent only for the limited purpose of issuing title insurance policies. Neither the Issuing Agent nor the Approved Attorney is the Company's Agent for the purpose of providing other closing or settlement services." Doc. 24-1, 2-6, 8, 10-14 at ¶ 4.

In 2010, Direct Title misappropriated client escrow funds. EnTitle investigated and determined Direct Title diverted money from its escrow account into its operating accounts. Direct Title used the funds to pay operating expenses and personal expenses of its principal, Christopher Durling. EnTitle was then asked by a number of lenders to pay the losses arising from the misconduct of Direct Title. EnTitle took responsibility for anyone to whom it issued a CPL. EnTitle stated:

> Direct Title was not an agent for EnTitle in connection with any escrow or escrow related activities and EnTitle expressly disavows any responsibility or liability for any escrow activities conducted by Direct Title, including but not limited to, loss of any funds placed in escrow with Direct Title…..in order to investigate you claim further…provide us with a copy of any document you believe creates a contractual relationship between yourself and EnTitle for the payment or honoring of said claim.

Doc. 27-6, 7-9. Accordingly, unless there was a CPL, EnTitle disavowed responsibility for any losses created by Direct Title's misappropriation of funds. In all 14 instances in which EnTitle issued a CPL, EnTitle determined it was contractually obligated to reimburse the client. EnTitle paid $3,574,220.23 in connection with the CPL claims.

5

### III. LAW AND ANALYSIS

#### A. Summary Judgment Standard

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party opposing summary judgment must show that there are facts genuinely in dispute, and must do so by citing to the record. Fed. R. Civ. P. 56(c)(1)(a). The Sixth Circuit has long held that "mere conclusions and unsupported allegations, rooted in speculation, do not meet that burden." *Bell v. Ohio State Univ.,* 351 F.3d 240, 253 (6th Cir. 2003) (citing *Bryant v. Commonwealth of Kentucky,* 490 F.2d 1273, 1274 (6th Cir. 1974)).

#### B. Insurance Policy Interpretation

In Ohio, normal rules of contract construction apply to the interpretation of insurance policies. *Weiss v. St. Paul Fire & Marine Ins. Co.,* 283 F.3d 790, 796 (6th Cir. 2002). When the terms of an insurance policy are clear and unambiguous, Ohio law requires a court to apply them to the facts without engaging in construction. *Toledo-Lucas. Cty. Port Auth. v. Axa Marine & Aviation Ins. (UK), Ltd.,* 368 F.3d 524, 530 (6th Cir. 2004) (citations and quotations omitted). "Conversely, when the insurer has drafted the contract and the provisions of the contract are ambiguous, a court must construe the terms strictly against the insurer and liberally in favor of the insured." *Id.* (citing *King v. Nationwide Ins. Co.,* 35 Ohio St.3d 208 (1988)) (internal quotations omitted). The insurer, not the insured, bears the burden of proving the applicability of an exclusion in its policy. *St. Mary's Foundry v. Employers Ins. of Wausau,* 332 F.3d 989, 993 (6th Cir. 2003)(citations omitted). "[O]nce the insurer establishes that an exclusion is applicable, the burden shifts back to the insured to establish the applicability of an exception to the exclusion." *Mosser Constr. Inc. v. Travelers Indem. Co.,* 430 Fed. Appx. 417, 421 (6th Cir.

2011) (citing *Goodrich Corp. v. Commercial Union Ins. Co.,* 2008 WL 2581579, at *23 (Ohio

Ct. App. June 30, 2008)). The insurer must be prepared to accept any reasonable interpretation in

favor of the insured. *Mosser Constr. Inc,.* 430 Fed. Appx. at 420-21(citing *Gomolka v. State

Auto. Mut. Ins. Co.,* 436 N.E.2d 1347, 1348 (1982). Exclusions in the insurance policies are

construed narrowly. *Id*.

### C.  Coverage

The Court must first determine whether coverage exists under the language of the Policy

before determining if any exclusions or exceptions apply. EnTitle seeks coverage under the

Policy for the amounts it paid pursuant to the CPLs issued in the 14 closings. EnTitle asserts

that Direct Title, whom EnTitle asserts it is legally responsible for, engaged in a Professional

Liability Wrongful Act triggering coverage under the Policy. EnTitle also alleges that the

payments made are Loss under the definition provided in the Policy. The Policy states:

> The Insurer will indemnify the Insured for Loss, including Defense Expenses,
> from any Claim or Extra-Contractual Claim first made against them during the
> Policy Period or any applicable Extended Reporting period and reported in
> accordance with Section VIII(G) of this Policy, for Professional Liability
> Wrongful Acts committed on or after the date of incorporation or formation of the
> Named Insured and prior to the end of the Policy Period.

Doc. 1-1 at pg. 17. Darwin argues that the amount paid out under the CPLs is not covered by the

Policy. Accordingly, EnTitle must show that it or an entity it was legally responsible for

committing a Professional Liability Wrongful Act during the time covered by the Policy and that

it falls under the definition of Loss.  Once EnTitle establishes this, Darwin must show the

applicability of an exception to escape its obligation to indemnify EnTitle for its payout under

the CPLs.

**i. Professional Liability Wrongful Act**

A Professional Liability Wrongful Act is defined under the Policy as "any actual or alleged act, error, omission, misstatement or misleading statement in the performance of or failure to perform Professional Services….by any Insured, or by an individual or entity for whom the Company is legally responsible." Doc. 3-1 at pg. 22. Accordingly, EnTitle must first show that either it or an entity it was legally responsible for engaged in a Professional Service[2]. EnTitle asserts that the issuance of CPLs is a Professional Services. In support of this assertion, EnTitle argues that the issuance of CPLs is customary in the industry and, therefore, a Professional Service Darwin expected EnTitle to engage in.

> This Court agrees.

> "As is customary in the industry, the title insurance underwriter usually issues a closing protection letter in connection with the transaction '[t]o verify the agent's authority to issue the underwriter's policies and to make the financial resources of the national title insurance underwriter available to indemnify lenders and purchasers for the local agent's errors or dishonesty with escrow or closing funds.'"

*J.P Morgan Chase Bank, N.A. v. First American Title Insurance Co.,* 795 F.Supp.2d 624, 628 (E.D. Mich. 2011); see *New Freedom Mortg. Corp. v. Globe Mortg. Corp.*, 761 N.W.2d 832, 842-43 (Mich. Ct. App. 2008)(quoting Joyce Palomar, *Title Insurance Law,* 2  § 20:11 (November 2011)).

CPLs are designed to persuade the underwriter's customers to trust their agents; thereby increasing policy sales. *New Freedom Mortg. Corp.,* 761 N.W.2d at 842–43. EnTitle issued CPLs to clients it obtains by virtue of its relationship with Direct Title. Each CPL is a binding

---

[2] Defined as "services performed by the Company or any Insured Person on behalf of the Company, for a policyholder, customer or client of the Company, pursuant to a policy of insurance issued by, or a written contract with, the Company, in the usual and customary conduct of the Company's business, for a fee or other business consideration." Doc. 3-1 at pg. 22.

contract between EnTitle and the client, and EnTitle claims CPLs are customary in the industry to increase sales.[3] Darwin had knowledge that EnTitle engaged in escrow/closing services, by its performance of an audit of EnTitle's finances in 2009-2010. Doc. 27-6 at pg. 4, 9. Accordingly, this Court finds that EnTitle's issuance of CPLs is a "Professional Service" under the terms of the Policy.

Next, the Court must determine whether Darwin is legally obligated to indemnify EnTitle for the amount paid out under the CPLs. To be a Professional Liability Wrongful Act, and therefore a covered Loss, EnTitle must next establish that by issuing CPLs it engaged misconduct. However, EnTitle did not make any "omission, misstatement or misleading statement in the performance of or failure to perform" in its issuance of CPLs. Doc. 3-1 at pg. 22. The misconduct that occurred was Direct Title's misappropriation of escrow funds, not EnTitle's issuance of CPLs. As evidence, EnTitle did not participate in any of the 14 closing transactions outside of the issuance of the CPLs, and each client that suffered a Loss asserts Direct Title was responsible.

The definition of Professional Liability Wrongful Act also includes coverage for "any entity for whom the Company is legally responsible." Doc. 3-1 at pg. 22. EnTitle asserts that it is legally responsible for Direct Title because EnTitle contractually obligated itself to "reimburse [clients] for actual loss incurred by you in connection with closings of real estate transactions conducted by the Issuing Agent or approved Attorney." Doc. 27-10, 11-24. Darwin asserts that EnTitle is not legally responsible for Direct Title, but they are contractually responsible.

The issuance of CPLs did not make EnTitle legally responsible for Direct Title. Instead, the CPLs made EnTitle contractually responsible. A contractual obligation to pay is not the same

---

[3] Issuing this type of closing and escrow services is a standard practice in the title insurance industry, and Darwin knew that EnTitle frequently offered both. Doc. 27-6.

as a legal obligation to pay. *Newman v. XL Specialty Insurance Co*., 2007 WL 2982751 at *4, (citing *Baylor Heating & Air Conditioning, Inc. v. Federated Mutual Insurance Co.,* 987 F.2d 415 (7th Cir. 1993)) (see also *Data Specialties, Inc. v. Transcon. Ins. Co.,* 125 F.3d 909, 913 (5th Cir. 1997)).  In addition, even with EnTitle's contractual right to inspect the accounts of Direct Title, the right to inspect an agent's accounts does not demonstrate the control necessary to hold a title insurer liable for the agent's mismanagement of escrow funds. *Pal Properties, LLC v. Ticor Title Ins. Co.,* 2008 WL 5158894, at *5 (Mich. Ct. App. December 9, 2008).

EnTitle demonstrates that it is not legally responsible for Direct Title through its own conduct. The Millers[4], one of Direct Title's clients, did not receive reimbursement until they proved they had a valid CPL agreement with EnTitle. EnTitle only reimbursed the losses stemming from Direct Title's misconduct for clients who received a CPL. In the absence of the CPLs, it would not have paid for *any* of the losses occasioned by Direct Title's fraud.  Doc. 27-6, 7-9.  EnTitle was not legally responsible for Direct Title, and EnTitle did not engage in any misconduct in its issuance of CPLs, therefore there is no Professional Liability Wrongful Act under the definition provided in the Policy. Accordingly, the Court finds that Darwin is not required to indemnify EnTitle for the payments made under the CPLs.

**ii.  Loss Exception**

Assuming, *arguendo*, Direct Title engaged in a covered Professional Wrongful Liability Act, the Policy's "Loss" exception would exclude coverage. The Policy defines Loss as "Defense Expenses, damages, pre-judgment interest, post-judgment interest, judgments, awards, settlements, punitive, or exemplary damages where insurable under applicable law, or other

---

[4] The Millers, with another borrower, filed suit against EnTitle and others in Nevada, and did not allege they had a CPL in their complaint. Once EnTitle determined that a CPL had been issued, the Millers were reimbursed.

amounts that an Insured is legally obligated to pay as a result of a Claim." Doc. 3-1 at pg. 20.

Loss does not include "amounts due under any contract or policy or insurance or reinsurance

underwritten, issued, assumed or subscribed to by the Company or any predecessor or affiliate

thereof".  *Id*. It also excludes "amounts due pursuant to an express contract or agreement,

including but not limited to any amount due under any contractual provision for liquidated

damages or pre-agreed damages or penalties, or any similar contractual remedy." *Id.* Moreover:

> No coverage will be available under [the] Policy for Loss, including Defense
> Expenses, from any Claim:  (3) for actual or alleged liability under any express
> contract or agreement; provided however solely with respect to the coverage
> provided under INSURING AGREEMENT B, this EXCLUSION (B)(4) shall not
> apply to that portion of a claim for a Professional Liability Wrongful Act.

*Id.* at 26.

Darwin asserts there is no coverage for this Loss because each of the Claims made

against EnTitle involves a CPL, an "express contract or agreement". Doc. 11 at ¶ 30. EnTitle

alleges that CPLs are not "contract[s] or polic[ies] of insurance" as defined under the Policy.

EnTitle paid out under each contractual obligation created by a CPL and now seeks

indemnification from Darwin; however, the analysis is no different than if EnTitle would have

breached on the CPLs.  EnTitle's interpretation of the Policy allows it to contract with any entity,

breach after receiving the benefit, then get coverage for the full contract price based on a

Professional Liability Insurance policy. This potentially opens the door for EnTitle to receive a

multimillion-dollar benefit for the cost of an insurance premium payment.

Numerous courts offer persuasive opinions. A company could "enter into a contract safe

in the assumption that if he later decides to engage in an act which might be considered a breach,

the insurance company will step forward to cover the consequences of his act if he was wrong;

and if he was right, he still walks away with no consequence to himself. Such a practice is

inimical to the entire concept of insurance." *Newman,* 2007 WL 2982751 at \*6, (quoting *Waste Corp. of America v. Genesis Insurance Co.,* 382 F.Supp.2d at 1355 (S.D. Fla. 2005)). "To allow indemnification…would have the effect of making the insurer a sort of silent business partner subject to great risk in the economic venture without any prospects of sharing in the economic benefit." *August Entm't, Inc. v. Philadelphia Indem. Ins. Co.,* 52 Cal. Rptr. 3d 908, 917 (Cal. Ct. App. 2007)(quoting *Toombs NJ, Inc. v. Aetna Casualty and Surety Co.,* 591 A.2d 304, 476 (Pa. Super. Ct. 1991). "Performance of a contractual obligation…is a debt the corporation voluntarily accepted. It is not a loss resulting from a wrongful act within the meaning of the policy." *August,* 52 Cal. Rptr. 3d 908. at 919. "Both legally and from the point of view of public policy" liability insurance companies are not interpreted to cover breach of contract claims. *Newman,* 2007 WL 2982751 at \*4. "Courts have consistently held that there is no wrongful act involved in a breach of contract claim as the claim arises out of the legal and voluntary action of creating a contract." *Id.* (see also *Baylor Heating & Air Conditioning, Inc.,* 987 F.2d 415 (7th Cir. 1993)).

The CPLs are a debt EnTitle voluntarily accepted, not a loss resulting from a wrongful act within the meaning of the Policy. "Even in the absence of an express exclusion, courts have held that a claim alleging breach of contract is not covered under a professional liability policy because there is no "wrongful act" and no 'loss' since the insured is simply being required to pay an amount it agreed to pay." Eric Mills and John Alan Appleman, *Appleman on Insurance Law and Practice* § 146.6 (2d Ed. 2003). Accordingly, Darwin is not contractually obligated to indemnify EnTitle for the amounts paid out under the CPLs.

## III. CONCLUSION

For the reasons set forth herein, Plaintiff EnTitle's Motion for Summary Judgment is DENIED, and Defendant Darwin's Motion for Summary Judgment GRANTED. The Court's

grant of Defendant's Declaratory Judgment counterclaim is dispositive of Plaintiff's claim for

breach of contract. Therefore, judgment is hereby entered in favor of Defendant for all claims.

IT IS SO ORDERED.


  February 1, 2013                               ____/s/ Judge John R. Adams_____
Date                                            JUDGE JOHN R. ADAMS
                                                UNITED STATES DISTRICT COURT